O

# United States District Court
# Central District of California

| | |
|---|---|
| FREE CONFERENCING CORPORATION,<br><br>            Plaintiff,<br><br>    v.<br><br>T-MOBILE US, INC. and BRYAN FLEMING,<br><br>            Defendants. | Case No. 2:14-cv-07113-ODW (SHx)<br><br>**ORDER GRANTING DEFENDANT T-MOBILE US, INC.'S MOTION TO STAY [22] AND GRANTING DEFENDANT FLEMING'S MOTION TO DISMISS [23]** |

## I. INTRODUCTION

There are two motions before the Court. The first motion is Defendant T-Mobile US, Inc.'s Motion to Dismiss or Stay Pursuant to the Doctrine of Primary Jurisdiction. (ECF No. 22.) The second motion is Defendant Bryan Fleming's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 23.) In the five-count Complaint, Plaintiff Free Conference Corporation alleges that Defendants wrongfully blocked calls from T-Mobile customers attempting to use Plaintiff's free conference call services. For the reasons discussed below, the Court **GRANTS**

///
///
///

Defendant T-Mobile US, Inc.'s Motion to Stay and **GRANTS** Defendant Bryan Fleming's Motion to Dismiss.[1]

## II. FACTUAL BACKGROUND

Free Conferencing Corporation ("Free Conferencing") is headquartered in Long Beach, California, and operates websites that promote "free" conference call services for its customers. (Erickson Decl. ¶ 2.) Free Conferencing contracts with local phone companies—also known as local exchange carriers ("LECs")—which provide the telecommunications infrastructure to host conference calls for Free Conferencing's customers. (Peterson Decl. ¶ 3.) The LECs provide the initial dial-in telephone number as well as the "conferencing bridges and other equipment" to facilitate the conference calls. (*Id.*) LECs then charge a termination fee to the telephone service providers—also known as interexchange carriers ("IXCs")—of the individuals on the conference call. (*Id.*) In other words, Free Conferencing provides its customers a conference call phone number associated with an LEC, and when the call ends the LEC charges the customers' phone providers—the IXCs—a termination fee.

Free Conferencing does not make money directly from its customers in this business model. Instead, the LECs pay Free Conferencing a "marketing fee" based on the amount of termination fees collected from IXCs. (Erickson Decl. ¶ 2.) This legal business model is called "access stimulation" and is regulated by the Federal Communications Commission ("FCC").[2]

---

[1] Having considered the papers filed in support of and in opposition to these motions, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

[2] The FCC describes access stimulation as follows:

> Access stimulation occurs when a LEC with high switched access rates enters into an agreement with a provider of high call volume operations such as chat lines, adult entertainment calls, and "free" conference calls. The arrangement inflates or stimulates the access minutes terminated to the LEC, and the LEC then shares a portion of the increased access revenues resulting from the increased demand with the "free" service provider, or offers some other benefit to the "free" service provider. The shared revenues received by the service

The success of an access stimulation business model is dependent on high termination fees charged by the LECs. LECs in rural areas are exempt from filing rate-control tariffs for termination fees and are authorized to charge higher termination fees than LECs in competitive markets. *See* 47 C.F.R. § 61.26(e). LECs are also authorized to privately negotiate termination fee agreements with individual IXCs. *Id.* at § 61.26(a)(3)(ii).[3]

An access stimulation business model is not at issue in this case, but is instead the salient backdrop for the dispute. Here, the relevant LEC is Great Lakes Communications Corporation ("Great Lakes"), a company with operations in Iowa. (Erickson Decl. ¶ 3.) The relevant IXC is Defendant T-Mobile US, Inc. ("T-Mobile"). Free Conferencing and Great Lakes are currently in a contract under which Free Conferencing's conference calls are supported by Great Lakes, and Free Conferencing is paid a marketing fee based on the amount of calls terminated by Great Lakes. (Erickson Decl. ¶ 2.) Great Lakes and T-Mobile also have a contractual agreement regarding the termination fees Great Lakes charges when one of T-Mobile's customer's calls is terminated on the Great Lakes network. (Erickson Decl. ¶¶ 6, 8.)

In August, 2014, a dispute arose between Great Lakes and T-Mobile regarding their termination fee contract. (Erickson Decl. ¶ 8.) T-Mobile then began routing all phone traffic bound for the Great Lakes network through alternate networks, such as

---

> provider cover its costs, and it therefore may not need to, and typically does not, assess a separate charge for the service it is offering. Meanwhile, the wireless and interexchange carriers (collectively IXCs) paying the increased access charges are forced to recover these costs from all their customers, even though many of the customers do not use the services stimulating the access demand.

*In re Connect America Fund*, 26 FCC Rcd. 17663, 17874 (2011).

[3] The FCC recently promulgated guidance to "address the adverse effects of access stimulation." *In re Connect America Fund*, 26 FCC Rcd. at 17875. The new guidance subjects rural LECs to federal rate controls when an LEC receives a significant increase of incoming traffic, among other criteria. *See id.* at 17874–90.

AT&T's network.  (Petersen Decl. ¶ 8.)  T-Mobile claims that Great Lakes "forced" it to reroute traffic.  (ECF 22-1 ["Def. PJD Br."] at 6.)  As a result of overloading the capacity of the AT&T network, T-Mobile customers immediately began receiving "all circuits busy" messages when attempting to call the Free Conferencing numbers associated with Great Lakes.  (Petersen Decl. ¶ 8; Erickson Decl. ¶ 3.)  Inundated with customer service complaints, Free Conferencing in turn complained to T-Mobile about the connection problems.  (Erickson Decl. ¶¶ 4–6.)  T-Mobile directed Free Conferencing's complaints to Great Lakes and refused to disclose any information regarding its dispute with Great Lakes.  (*Id.*)

Free Conferencing alleges that T-Mobile purposefully limited calls from its own customers to the Great Lakes network as a "negotiation strategy" with Great Lakes.  (Erickson Decl. ¶¶ 8–9.)  Negotiations between Great Lakes and T-Mobile have allegedly broken down and the parties are currently engaged in a confidential alternative dispute resolution process.  (Peterson Decl. ¶ 13.)  By overloading the AT&T network and disrupting its own customers' calls, T-Mobile cost Free Conferencing "more than 33 million minutes of use" and associated marketing fees.  (Peterson Decl. ¶ 7.)  The contract dispute between Great Lakes and T-Mobile is also allegedly costing Free Conferencing past and future customers.  (*Id.*)

Free Conferencing brings five causes of action against Defendants T-Mobile and Bryan Fleming ("Fleming"), a T-Mobile executive.  Count I alleges intentional interference with contract—T-Mobile intended to disrupt the performance of Free Conferencing's contract with Great Lakes by limiting traffic to the Great Lakes network.  (Compl. ¶¶ 24–31.)  Count II alleges intentional interference with Free Conferencing's "Terms and Conditions" agreements with its registered users—T-Mobile intended to disrupt these customer agreements by limiting traffic to the Great Lakes network  (Compl. ¶¶ 32–39.)  Court III alleges intentional interference with prospective economic relations—T-Mobile intended to disrupt the relationships between Free Conferencing and future customers by limiting traffic to the Great Lakes

network. (Compl. ¶¶ 40–48.) Court IV alleges a violation of the California's Unfair Competition Law ("UCL"), Business & Professions Code § 17200—T-Mobile, by violating Section 201 of the Federal Communications Act ("FCA"), 47 U.S.C. § 201, engaged in an unlawful business practice. (Compl. ¶¶ 49–54.) And Count V alleges a violation of Washington's Unfair and Deceptive Practices Act, RCW § 19.86.010—T-Mobile engaged in an unfair method of competition by limiting traffic to the Great Lakes network. (Compl. ¶¶ 55–60.)

### III.  PRIMARY JURISDICTION

T-Mobile moves the Court to stay or dismiss all five counts in the Complaint on the grounds that the doctrine of primary jurisdiction applies. (Def. PJD Br. at 1.) T-Mobile brings the Motion "pursuant to Fed. R. Civ. P. 12(b)(1) and the doctrine of primary jurisdiction." (*Id.*) However, "[p]rimary jurisdiction is not a doctrine that implicates the subject matter jurisdiction of the federal courts." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2001). As discussed *infra*, staying or dismissing the Complaint implicates the prudential powers of the Court, and not the Court's subject matter jurisdiction.

As an initial matter, the Court rejects Free Conferencing's argument that FCC "has no expertise or jurisdiction to handle the state tort claims at issue here." (ECF No. 27 ["Pl. PJD Br."] at 1.) The primary jurisdiction doctrine is used "whenever enforcement of the claim requires the resolution of *issues*," and an *issue* in this case is whether T-Mobile violated federal telecommunications statutes and regulations. *See United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956) (emphasis added). While it is true that the FCC cannot adjudicate a California intentional interference or UCL cause of action, the FCC can issue a declaratory ruling on whether or not T-Mobile's practices violate federal telecommunications law. *See* 47 U.S.C. § 207. The resolution of that issue, whether by the Court or the FCC, is not the adjudication of any cause of action in this case.

/ / /

For the reasons discussed below, the Court finds that the primary jurisdiction doctrine applies to the entire Complaint, and therefore this case is stayed pending the resolution of Free Conferencing's administrative proceedings.

## A. LEGAL STANDARD

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). The doctrine is considered a "prudential" measure, "under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Id*.

While there is "[n]o fixed formula for applying the doctrine of primary jurisdiction," *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086 (9th Cir. 2006), the Court is instructed by the holding in *United States v. General Dynamics Corp.*, 828 F.3d 1356, 1362 (9th Cir. 1987). *General Dynamics* instructs that four factors are "uniformly present in cases where primary jurisdiction is properly invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Id.* The Ninth Circuit further explains that primary jurisdiction is proper for an "issue of first impression, or a particularly complicated issue" where the "protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark*, 523 F.3d at 1114 (internal citations and quotation marks omitted).

## B. APPLICATION

T-Mobile asserts that the Court should dismiss or stay all five counts in the Complaint under primary jurisdiction. (Def. PJD Br. at 2.) In order for this Court to

determine whether primary jurisdiction applies, it must first decide whether each cause of action invokes a comprehensive regulatory scheme—the first three factors from *General Dynamics*. The Court must then decide whether or not the telecommunications issues involve complicated technical and policy questions, and whether the Court has sufficient regulatory guidance to adjudicate such issues—the fourth factor from *General Dynamics*. For ease of discussion, the Court will first address Count IV, which is brought under the UCL, and then proceed to the other four counts.

1. COUNT IV—CALIFORNIA'S UCL

Count IV alleges a violation of California's UCL which prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. (Compl. ¶ 49.) "Unlawful business activity . . . includes anything that can properly be called a business practice and that at the same time is forbidden by law." *Farmers Ins. Exch. v. Superior Court*, 826 P.2d 730, 734 (Cal. 1992).

Free Conferencing acknowledges that elements of the FCA and FCC regulations are potentially intertwined in this cause of action. The Complaint asserts that T-Mobile engaged in "unlawful" conduct prohibited by the UCL because T-Mobile's conduct "constitutes a violation of the Federal Communications Act and the regulations and orders promulgated by the [Federal Communications] Commission." (Compl. ¶ 51.) Free Conferencing alleges that T-Mobile violated federal law in three different ways: (1) "providing degraded service to subscribers seeking to reach Free Conferencing conferencing services terminating at Great Lakes and fail[ing] to correct the problems or ensure that intermediate providers . . . were performing adequately"; (2) "blocking, choking, reducing or restricting telephone traffic"; and (3) "fail[ing] to make appropriate use of termination suppliers to ensure calls of its customers terminate reliably." (Compl. ¶ 50.) In examining the suggested factors from *General Dynamics*, the Court finds the first three factors easily satisfied and undisputed—this (1) issue originates from (3) the comprehensive FCA regulatory scheme which (2) the

FCC is charged with administering under 47 U.S.C. §§ 151, 154. *See General Dynamics*, 828 F.3d at 1362.

Since Count IV involves a matter of a comprehensive regulatory scheme administered by the FCC, the Court must now decide whether or not the resolution of this cause of action "requires expertise or uniformity in administration" of a "particularly complicated issue." *Id.*; *Clark*, 523 F.3d at 1114. To do so, the Court must first examine the relevant statutes and regulations, and decide if these laws provide the Court sufficient guidance to adjudicate Court IV.

*i. Statutory and Regulatory Background*

The FCA is administered by the FCC and imposes a variety of obligations on telecommunications carriers. 47 U.S.C. §§ 151, 154. Section 201(b) of the FCA states: "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." *Id.* § 201(b). Section 202(a) states that it "shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities or services[.]" *Id.* § 202(a). Section 207 of the FCA provides that "any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the [FCC] . . . or may bring suit for the recovery of damages . . . in any district court of the United States of competent jurisdiction." *Id.* § 207.

The FCC regularly expounds upon the language of sections 201 and 202, and has a created a regulatory framework applicable to this case. The FCC declared that "the practice of call blocking, coupled with a failure to provide adequate consumer information, is an unjust and unreasonable violation of Section 201(b) of the [FCA]." *Telecomms. Research and Action Ctr. and Consumer Action v. Central Corp.* 4 FCC Rcd 2157, 2195 (1989). "Specifically, [FCC] precedent provides that no carriers, including interexchange carriers, may block, choke, reduce or restrict traffic in any

way." *In re Establishing Just and Reasonable Rates for Local Exchange Carriers*, 22 FCC Rcd 11629, 11631 (2007).

In 2012, the FCC published *In re Developing a Unified Intercarrier Compensation Regime*, which addresses "a pattern of call completion and service quality problems on long distance calls to certain rural areas." 27 FCC Rcd 1351, 1351 (2012) (the "Declaratory Ruling"). In describing the "[c]all completing problems," the Declaratory Ruling recites a fact pattern nearly identical to the facts in this present case—"rural areas" with "higher" rates, and "long distance providers" seeking new ways to "route" calls "at the lowest cost possible." *Id.* at 1354. The Declaratory Ruling "remind[s] carriers of the [FCC's] longstanding prohibition on carriers blocking, choking, reducing or otherwise restricting traffic," and "clarif[ies] that this prohibition extends to the routing practices . . . that have the effect of blocking, choking, reducing, or otherwise restricting traffic." *Id.* at 1352. The Declaratory Ruling unequivocally states that the routing "practices such as those described herein that lead to call termination and call quality problems may constitute unjust and unreasonable practices in violation of section 201 of [the FCA], and/or may violate a carrier's section 202 duty to refrain from unjust or unreasonable discrimination in practices facilities, or services." *Id.* The Declaratory Ruling also states that "it is an unjust and unreasonable practice in violation of section 201 of the [FCA] for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers . . . are performing adequately." *Id.* at 1355–56.

While these passages from the Declaratory Ruling appear unremitting, the Declaratory Ruling then concedes that the standards for identifying such violations are not precise. The Declaratory Ruling disclaims that "nothing in this Declaratory Ruling should be construed to dictate how carriers must route their traffic." *Id.* at 1356. It then provides the following "guidance" for unlawful conduct: "We note in this context that what constitutes an unreasonable number of calls failing to complete

1 to rural areas could be a relatively low percentage of calls being carried to all
2 destinations by a particular carrier." *Id.* at 1356 n.37. Nothing further—such as clear
3 criteria for courts—is provided. The Declaratory Ruling also states that the FCC is
4 "neither mandating specific contracting or management practices nor suggesting that
5 such practices would absolve a carrier of liability for a failure nonetheless to ensure
6 that calls are being completed in a just and reasonable manner." *Id.* at 1356 n.36. The
7 section on "Enforcement" explains that "[i]f a carrier engages in any of the prohibited
8 activities described above, the Commission can take appropriate action pursuant to the
9 remedies available under statutory authority, including cease-and-desist orders,
10 forfeitures, and license revocations." *Id.* at 1358–59. The federal courts are not
11 mentioned.

12 Following a notice-and-comment rulemaking period in 2013, the FCC
13 published an order on this issue. *In Re Matter of Rural Call Completion*, 28 FCC Rcd.
14 16154 (2013) (the "FCC Order"). The FCC Order "adopt[s] recording, retention, and
15 reporting requirements to substantially increase [the FCC's] ability to monitor and
16 redress problems associated with completing calls to rural areas." *Id.* ¶ 19. The FCC
17 Order generally requires all carriers to keep records on call attempts, connections, and
18 routing practices, and to regularly report certain technical data and information to the
19 FCC. *Id*. ¶¶ 40–84. Such data includes the "calling party number; called party
20 number; date; time of day; whether the call is handed off to an intermediate provider
21 and, if so, which intermediate provider; whether the call is going to a rural carrier [];
22 whether the call is interstate; and whether the call attempt was answered." *Id.* ¶ 40.
23 The FCC Order then states: "We now conclude that these data—as well as certain
24 cause code information—are necessary to permit us to identify and redress call
25 completing problems." *Id.*

26         *ii. Application*

27 T-Mobile asserts that the FCC has yet to provide "specific guidance regarding
28 what constitutes a violation of the [Declaratory Ruling]." (Def. PJD Br. at 3.)

1 According to T-Mobile, the FCC has not "defined when service is 'degraded' or a carrier is 'performing adequately,' or what constitutes a 'reasonable percentage' of completed calls." (*Id.*) On the other hand, Free Conferencing argues that there is no need for FCC expertise because "the FCC has spoken clearly and often on call blocking and rural call completion," such that whether or not T-Mobile's conduct violated federal law is not a "novel" legal issue. (Pl. PJD Br. at 15, 23.)

Free Conferencing is misguided. Despite the FCC's explicit pronouncements that prohibit call blocking and degraded services, the FCC repeatedly acknowledges the complex and fluid nature of these issues. The Declaratory Ruling does not require specific traffic routing procedures, offers no definition of "degraded" services or "adequate" performance, and does not mandate *any* procedure to ensure calls are completed. Free Conferencing failed to identify a single case in which a federal court wrestled with these issues. The Declaratory Order also makes no mention of the federal courts and specifically defines the FCC as the appropriate enforcement authority.

The Court is particularly concerned with the guidance in the FCC Order. The FCC Order now mandates detailed and lengthy record keeping and reporting requirements. These new requirements "are *necessary* to permit [the FCC] to identify and redress call completing problems." *In re Rural Call Completion*, 28 FCC Rcd. 16154 ¶ 40 (emphasis added). The FCC Order does not indicate how the mountain of "necessary" records is analyzed or how the FCC will identify and analyze "call completing problems." What then would the Court do with these records?

The resolution of this issue—whether or not T-Mobile violated the FCA and FCC regulations—is why the primary jurisdiction doctrine exists. This is "an issue of first impression" of a "particularly complicated issue" that "requires expertise or uniformity in administration." *Clark*, 523 F.3d at 1114; *General Dynamics*, 828 F.3d at 1362.

/ / /

1    The Court specifically notes that re-routing calls to rural LECs is an evolving area of law. The Declaratory Ruling was published in 2012 and the FCC Order in 2013. The Declaratory Ruling observes that "comprehensive[] reform" is underway and will "gradually reduce most termination charges, which, at the end of the transition, should eliminate the primary incentives for cost-saving practices that appear to be undermining the reliability of telephone services." *In re Developing a Unified Intercarrier Compensation Regime*, 27 FCC Rcd at 1355. This statement is evidence that the FCC sees this area of law as evolving, and further supports the Court's decision not to meddle here. It is important to "protect[] the integrity" of the FCC's evolving regulatory scheme. *General Dynamics*, 828 F.2d at 1362.

Free Conferencing claims that since it is not a telecommunications carrier subject to FCC jurisdiction, "it is in fact now precluded from filing a complaint with the FCC." (Pl. PJD Br. at 20.) Free Conferencing is mistaken. Section 207 states that "[*a*]*ny* person claiming to be damaged by any common carrier . . . may [] make complaint to the [FCC] . . . ." 27 U.S.C. § 207 (emphasis added). Additionally, the FCC Order states that the FCC "will continue to look into complaints from rural LECs and consumers and pursue enforcement action where warranted." *In re Rural Call Completion*, 28 FCC Rcd. at ¶ 27. There is nothing standing in the way of Free Conferencing from receiving a declaratory ruling from the FCC.

For the reasons just stated, the Court finds that the primary jurisdiction doctrine applies and the initial decision-making responsibility for Count IV should be performed by the FCC.

2. COUNTS I, II, AND III—INTENTIONAL INTERFERENCE CLAIMS

Counts I–III of the Complaint all allege various forms of common law intentional interference. (Compl. ¶¶ 24–48.) The factual basis for Counts I–III is T-Mobile's "inten[t] to disrupt" Free Conferencing's contractual agreements by (1) "preventing" its customers from reaching the Great Lakes network, (2) not "making

adequate arrangements to complete calls," and (3) "refusing to address the degraded service to Great Lakes." (Compl. ¶¶ 27, 35, 43.)

T-Mobile argues that each of these three claims invoke T-Mobile's obligations under FCC regulations to not block calls, provide "adequate arrangements," and address complaints of degraded service. (Def. PJD Br. at 8.) T-Mobile claims that "in order to prevail on each and every one of its claims, [Free Conferencing] will need to prove that T-Mobile violated [federal regulations]," thus triggering the primary jurisdiction doctrine. (Def. PJD Br. at 1.)

The factual basis and language found in Counts I–III, while not explicitly asserting violations of federal law, most certainly parallels prohibited conduct under the Declaratory Ruling and FCC Order, and suggests that proof of a federal violation is necessary to succeed on each count. *See supra* Part III.B.1.i. Such conduct is not independently unlawful absent federal regulation.

However, Free Conferencing responds that Counts I–III only involve issues of California tort law and not issues relevant to the FCA. According to Free Conferencing, "[t]his case is about T-Mobile's callous decision to negotiate a better price under its existing contracts with Great Lakes, knowing that it would be ignoring it [*sic*] obligations to its own customers to complete their calls and interfering with the contract that are essential to Free Conferencing's business." (Pl. PJD Br. at 12.) Free Conferencing argues that "[w]hether a federal standard has been breached is but one element of one of the five causes of action in the case"—the UCL claim—and the resolution of Counts I–III only involve "commercial agreements and contracts." (*Id.* at 12, 16.) Free Conferencing is consistent in furthering this theory of liability—one that does not involve federal regulations—throughout its Opposition Brief.

If the resolution of Counts I–III only involves basic contract and tort law principles, then there would be no need for the Court to determine whether a federal law was violated. This Court could adjudicate Counts I–III by simply determining whether T-Mobile's decision to allegedly breach a contract gives rise to an intentional

interference claim to a third party. However, the resolution of these claims is not so simple. Counts I–III will each involve resolution of affirmative defenses, such as privilege, and will likely involve determinations of "unlawful" conduct. For example, "a claim for interference with prospective economic advantage requires proof that the defendant 'not only interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Della Penna v. Toyota Motor Sales, USA, Inc.*, 902 P.2d 740, 751 (Cal. 1995)). The "legal measure" required by *Fresno Motors* would most likely be a violation of FCC regulations.

While Free Conferencing repeatedly assures the Court that *no* issues of telecommunications are involved in Counts I–III, the Court cannot overlook the factual bases for Counts I–III, which are *exact* recitations of prohibited activities under federal law. The Court also cannot overlook the availability of future defenses that may trigger considerations of a complex administrative scheme. The Court is confident that the alleged violations of federal law would eventually surface in this litigation. The primary jurisdiction doctrine is a "prudential" tool of the Court, and prudence advises the Court that Counts I–III "implicate[ ] technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Clark*, 523 F.3d at 1114. The primary jurisdiction doctrine applies to Counts I–III.

### 3. COUNT V—WASHINGTON'S UNFAIR COMPETITION LAW

Count V alleges a violation of Washington's unfair competition law, RCW 19.86.020. (Compl. ¶¶ 50, 56.) The factual basis for this cause of action is identical to the intentional interference claims—a recitation of FCC prohibitions without citing FCC regulations. Free Conferencing argues that its cause of action under Washington law does not involve any "element that comes within any FCC jurisdiction or expertise." (Pl. PJD Br. at 15.)

Despite Free Conferencing's stalwart assurances, the Court is thoroughly unconvinced that this claim does not and will not involve any matter related to T-Mobile's alleged violation of FCC regulations. Incorporating the Court's analysis from Counts I–IV, *supra*, the Court finds that the primary jurisdiction doctrine applies to Count V.

## C. STAY OR DISMISS

"Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Syntek*, 307 F.3d at 782 (quoting *Reiter v. Cooper*, 507 U.S. 258, 268–69 (1993)). "Normally, if the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies." *Id.* However, "the question of whether a party is 'unfairly advantaged' by dismissal must also be considered." *Id.*

Since the statute of limitation may prevent Free Conferencing from refiling its claim at the conclusion of the administrative proceedings, the Court stays the Complaint in its entirety.

## IV. PERSONAL JURISDICTION

The second motion is brought pursuant to Rule 12(b)(2) and asserts that the Court lacks personal jurisdiction over Fleming, a T-Mobile corporate executive and citizen of Washington state. (ECF No. 23.) Fleming has no meaningful contacts with California and therefore the Court lacks personal jurisdiction over him. The Motion is granted.

## A. LEGAL STANDARD

A defendant may move to dismiss a case for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The plaintiff bears the burden of demonstrating that jurisdiction exists. *Love v. Assoc. Newspapers Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010). When a district court acts on a defendant's motion to dismiss

without holding an evidentiary hearing, the plaintiff must only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss. *See Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). The plaintiff's version of facts is taken as true and conflicts between the facts must be resolved in plaintiff's favor. *Id.*

District courts have the power to exercise personal jurisdiction to the extent of the law of the state in which they sit. Fed. R. Civ. P. 4(k)(1)(A); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). California's long-arm jurisdictional statute is coextensive with federal due-process requirements. Cal. Civ. Proc. Code § 410.10; *Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991). The Due Process Clauses of the Fifth and Fourteenth Amendments require that a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

Using the "minimum contacts" analysis, a court may obtain either general or specific jurisdiction over a non-resident defendant. *Unocal Corp.*, 248 F.3d at 923. A court has general jurisdiction when the defendant engages in "continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (internal quotations marks and citations omitted). For specific jurisdiction, the Ninth Circuit has expounded a three-part test: (1) the defendant must purposefully avail himself of the benefits and protections of the forum state; (2) the claim must arise out of, or be related to, the defendant's forum-based activity; and (3) exercise of jurisdiction must comport with fair play and substantial justice. *Schwarzenegger*, 374 F.3d at 802; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

**B.  DISCUSSION**

As an initial matter, Fleming's corporate executive role at T-Mobile does not change the personal jurisdiction analysis. The Supreme Court is clear that a

defendant's contacts with the forum "are not to be judged according to their employer's activities. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 789–90 (1984).

Free Conferencing asserts that the Court has specific personal jurisdiction over Fleming—a Washington citizen—because "he intentionally targeted the tortious activities described [in the Complaint] towards a California resident and expressly aimed his conduct at a California resident." (Compl. ¶ 2.) The only alleged facts associated with California are (1) Fleming's knowledge that Free Conferencing, a California corporation, "would be significantly affected" by T-Mobile's negotiation strategy with an Iowa company, (2) Fleming's knowledge that many of the alleged blocked calls would come from customers in California, and (3) Fleming's e-mail exchange with Free Conferencing's executives in California. (ECF No. 28 at 17.)

The Supreme Court recently foreclosed a theory of personal jurisdiction based on the defendant's knowledge of where the plaintiff would suffer the alleged harm. In *Walden v. Fiore*, 134 S. Ct. 1115, 1119 (2014), the high court was asked to decide whether "a court in Nevada may exercise personal jurisdiction over a defendant on the basis that [the Georgia defendant] knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." The Supreme Court explained that for "a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 1121. This "relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State," and the "analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 1122 (internal citations omitted) (original emphasis).

In reaching this conclusion, the *Walden* Court rejected the Ninth Circuit's approach which focused on (1) the defendant's knowledge of the plaintiff's strong Nevada connections, and (2) the plaintiff's foreseeable harm in Nevada. *Id.* at 1124.

The Supreme Court explained that this approach "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. [The defendant's] actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." *Id.* The Supreme Court directed that the "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.*

Here, Free Conferencing's theory of personal jurisdiction is identical to the rejected Ninth Circuit approach in *Walden*. Free Conferencing alleges that Fleming "intentionally targeted the tortious activities . . . towards a California resident and expressly aimed his conduct at a California resident." (Compl. ¶ 2.) *Walden* expressly forecloses personal jurisdiction "simply because [the defendant] directed his conduct at plaintiffs whom he knew had [forum] connections." *Walden*, 134 S. Ct. at 1124. Claiming that Fleming knew Free Conferencing was a California company and would suffer the alleged harm in California "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.*

The only other connections between Fleming and California are Fleming's knowledge that California customers would not be able to complete calls to Great Lakes and Fleming's e-mails to Free Conferencing's executives. Both of these contacts are also legally insufficient. First, if *Walden* precludes personal jurisdiction on the basis of where the plaintiff suffers the harm, the alleged harm to non-parties is utterly irrelevant. Second, Fleming's e-mails to Free Conferencing executives, which were sent in *response* to inquiries from Free Conferencing, are nothing more than "contacts with persons who reside [in the forum]." *Id.* at 1122. A handful of responsive e-mails discussing a contract dispute in Iowa do not legally establish a "substantial connection" with California to confer personal jurisdiction over Fleming. *Id.* at 1121.

/ / /

Once again, these are not connections with the forum, but instead with the plaintiff (and non-parties), and therefore cannot confer personal jurisdiction. *See id.*

Free Conferencing's theory of personal jurisdiction runs afoul of the Supreme Court's dictates in *Walden*. Fleming did not purposefully avail himself of the benefits and protections of California and Fleming has no legally sufficient California-based activity to establish personal jurisdiction. *See Schwarzenegger*, 374 F.3d at 802. Free Conferencing failed to make a prima facie showing of jurisdictional facts and therefore the Court GRANTS Fleming's Rule 12(b)(2) Motion to Dismiss.

## V.  CONCLUSION

For the reasons discussed above, the Court hereby **GRANTS** Defendant T-Mobile's Motion to Stay (ECF No. 22), and **GRANTS** Defendant Fleming's Rule 12(b)(2) Motion to Dismiss, (ECF No. 23). Fleming is dismissed from the case, and this matter is stayed in its entirety.

**IT IS SO ORDERED.**

December 30, 2014

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**